AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Verizon HTC cellular telephone, Model 100L, bearing serial number FA61MSX00194 and IMEI number 990005708930061 | ) ) ) ) ) ) Case No. 3:16-mj-306<br><br>MICHAEL J. NEWMAN |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the    Southern    District of    Ohio   , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C-1 | |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrea R. Kinzig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/18/16

*Judge's signature*

City and state: Dayton, Ohio    Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Andrea R. Kinzig, being duly sworn, depose and state as follows:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses involving kidnapping and firearms.

2. Along with other officers of the Vandalia (Ohio) Police Department, Richmond (Indiana) Police Department, and Miami Township (Ohio) Police Department, I am currently involved in an investigation of kidnapping and firearms offenses committed by JAMES R. MARRIOTT (hereinafter referred to as "MARRIOTT"), ANDREW AZZALINA (hereinafter referred to as "AZZALINA"), and TAYLOR N. KARAS (hereinafter referred to as "KARAS"). I submit this Affidavit in support of Applications for search warrants for the following:

    a. Verizon HTC cellular telephone, Model 100L, bearing serial number FA61MSX00194 and IMEI number 990005708930061, currently located at the Miami Township Police Department, 2660 Lyons Road, Miamisburg, Ohio, 45342 (hereinafter referred to as **SUBJECT DEVICE-1** and more fully described in Attachment A-1);

    b. Cricket Microsoft Mobile cellular telephone, Model RM-1073, bearing IMEI number 357815061306684 and SKU DMCN4001, currently located at the Miami Township Police Department, 2660 Lyons Road, Miamisburg, Ohio, 45342 (hereinafter referred to as **SUBJECT DEVICE-2** and more fully described in Attachment A-2);

    c. ZTE cellular telephone, Model N9132, bearing serial number 329763723675, currently located in the personal property of Andrew Azzalina at the Preble County Jail, 1139 Preble Drive, Eaton, Ohio, 45320 (hereinafter referred to as **SUBJECT DEVICE-3** and more fully described in Attachment A-3).

3. The devices are more fully described in Attachments A-1 through A-3. The purpose of the Applications is to seize evidence of violations of 18 U.S.C. §371 (Conspiracy), 18 U.S.C. §1201 (Kidnapping), 18 U.S.C. §924(c) (Use of a Firearm During and in Relation of a Crime of Violence), 18 U.S.C. §922(g) (Possession of a Firearm by a Prohibited Person), 18 U.S.C. §2312 (Interstate Transportation of Stolen Vehicles), and 18 U.S.C. §2313 (Receipt, Possession, Storage, Concealment, Barter, Sale, and Disposal of

1

Interstate Stolen Vehicles). The items to be searched for and seized are described more particularly in Attachments B-1 through B-3.

4. As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other officers involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

5. This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support searches of the noted devices (as described in Attachments A-1 through A-3).

6. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 371, 1201, 924(c), 922(g), 2312, and 2313, are present within the information associated with the noted devices (as described in Attachments A-1 through A-3).

## BACKGROUND INFORMATION:

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

2

    connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

  c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state

## FACTS SUPPORTING PROBABLE CAUSE

8. On October 6, 2016, officers of the Richmond Police Department responded to a Dick's Sporting Goods store in Richmond, Indiana, after receiving a call that a man was in duress and needed assistance. Upon arriving at the store, officers made contact with a 79-year old man who will be referred to for purposes of this Affidavit as "Adult Male A". Adult Male A reported that he had been held against his will and transported from Vandalia, Ohio to Richmond, Indiana by two men and one woman. Adult Male A identified the woman as KARAS, but he did not know the names of the two male

3

subjects. According to Adult Male A, the three subjects had stolen various items from him and used or attempted to use his credit cards at various locations in Ohio before arriving in Indiana. Before officers arrived, the three subjects departed from the store with Adult Male A's vehicle.

9. After speaking to officers from the Richmond Police Department, Adult Male A returned to his residence in Clark County, Ohio. Adult Male A filed an additional report with the Vandalia Police Department, and he was interviewed on several occasions by officers and your Affiant. In summary, Adult Male A provided the following information during the various interviews:

    a. Approximately six years ago, KARAS dated Adult Male A's grandson. For the past approximately one year, KARAS asked to borrow various amounts of money from Adult Male A. KARAS claimed to need the money for food and gasoline. Adult Male A loaned her various amounts of money, up to approximately $100. KARAS had re-paid the money on most of the previous occasions.

    b. During the early afternoon hours of October 6, 2016, KARAS sent Adult Male A a text message asking if she could borrow money from him. Adult Male A originally agreed to meet her at a restaurant to provide her with the money. KARAS later asked Adult Male A to meet her at the Super 8 hotel in Vandalia, Ohio. Adult Male A drove to the hotel in his 2008 Ford Explorer Sport Trac vehicle and met KARAS in room 124.

    c. Shortly after Adult Male A arrived at the hotel room, KARAS went into the bathroom for a long period of time. Two white males who will be referred to in the following sub-paragraphs as "SUBJECT-1" and "SUBJECT-2" then entered the hotel room. SUBJECT-1 had an off-black revolver in his hand and pointed it at Adult Male A. One of the subjects asked where the money was, and they both began searching through Adult Male A's belongings. The subjects made Adult Male A remove his pants so they could search the contents of his pockets. The subjects went through KARAS's purse as well, although it appeared to Adult Male A that they were not actually stealing anything from her. KARAS eventually came out of the bathroom, and Adult Male A thought she looked scared.

    d. After finding Adult Male A's credit card, SUBJECT-1 asked for its PIN number. Adult Male A did not know his PIN number and told this to SUBJECT-1. SUBJECT-1 called Adult Male A a liar, threatened to kill him, and cocked the gun.

4

e. SUBJECT-1 said that they were going to go to an Automated Teller Machine (ATM) to get money, and he instructed KARAS to bring Adult Male A's vehicle over to the hotel room. At SUBJECT-1's instruction, Adult Male A got into the front passenger seat. SUBJECT-1 and KARAS got into the back seat, and SUBJECT-2 got into the driver's seat. SUBJECT-1 continued to hold the gun in his hand, and he pointed it at Adult Male A at various times. SUBJECT-2 asked for the gun at one point during the car ride so that he could shoot Adult Male A in the foot, but SUBJECT-1 did not give the gun to SUBJECT-2 at that time.

f. SUBJECT-2 drove Adult Male A's vehicle to a Chase Bank in Englewood, Ohio. SUBJECT-1 attempted to get money out of the ATM but was unable to do so. He continued to ask Adult Male A for the PIN number for the credit card and threatened to kill Adult Male A if the PIN number was not provided. At one point while at the ATM or during the car ride, KARAS provided SUBJECT-1 with several possible numbers that could be the PIN number for Adult Male A's credit card.

g. SUBJECT-2 continued driving and eventually pulled over on a gravel area at a ninety degree curve, somewhere in or around Eaton, Ohio. SUBJECT-1 and SUBJECT-2 accessed the trunk compartment of the vehicle and began going through Adult Male A's belongings. They threw a number of documents and belongings out of the vehicle. As they drove away, SUBJECT-2 said he wanted to throw Adult Male A into a stone quarry that was nearby.

h. SUBJECT-2 drove to a Dollar General Store in or near Lewisburg, Ohio. SUBJECT-1 and KARAS went into the store to make a purchase. SUBJECT-1 gave SUBJECT-2 the revolver, and SUBJECT-2 remained in the vehicle with Adult Male A. SUBJECT-2 kept the revolver on his lap and told Adult Male A to stay in the vehicle.

i. SUBJECT-1 and KARAS returned to the vehicle, and SUBJECT-2 drove to Richmond, Indiana. SUBJECT-2 first said that he wanted to rent a rental vehicle and then said that he wanted to go to Dick's Sporting Goods store. SUBJECT-2 drove to the store, and SUBJECT-1 and KARAS again went into the store while SUBJECT-2 remained in the vehicle with Adult Male A. SUBJECT-2 told Adult Male A not to move and again kept the revolver on his lap.

5

j. SUBJECT-1 returned to the vehicle and told Adult Male A to come into the store to sign for the purchase. Adult Male A went into the store with SUBJECT-1. KARAS told SUBJECT-1 that he would be killed if he said anything.

k. The clerk needed Adult Male A's driver's license for the transaction, so SUBJECT-1 telephonically asked SUBJECT-2 to bring the license into the store. SUBJECT-2 gave Adult Male A the license at the store's entry doors. Adult Male A then signed for the transaction and put his driver's license and American Express credit card in his pocket. He mouthed to a store manager to call the police. SUBJECT-1 was nearby and could potentially have seen this occur.

l. Adult Male A asked to go to the bathroom, and SUBJECT-1 agreed. When Adult Male A came out of the bathroom, SUBJECT-1, SUBJECT-2, and KARAS had already left in Adult Male A's vehicle. Police officers arrived shortly thereafter, and Adult Male A provided a statement to the officers.

10. Throughout the course of the investigation (much of which is summarized below), Vandalia Police Department officers developed various suspects of SUBJECT-1's and SUBJECT-2's identities. Several photographic line-ups were shown to Adult Male A. When shown a line-up containing an older photograph of MARRIOTT, Adult Male A did not identify anyone in the line-up. When later shown another photographic line-up containing a recent photograph of MARRIOTT, Adult Male A identified the photograph of MARRIOTT as being SUBJECT-1 (although he expressed some reservation or doubt). When shown a photographic line-up containing a photograph of AZZALINA, Adult Male A identified AZZALINA as being SUBJECT-2.

11. On October 7, 2016, hotel management at the Super 8 hotel contacted the Vandalia Police Department and reported that they learned that the televisions for rooms 124 and 230 had been stolen. Officers were dispatched to the hotel to take a report. The following information was obtained during the course of the officers' investigation:

a. Hotel management provided officers with registration paperwork for rooms 124 and 230. This paperwork identified that room 124 (the room where Adult Male A initially met KARAS) was rented in the name of KARAS, with an arrival date of October 6, 2016 and a departure date of October 7, 2016. Room 230 was rented in the name of Chris Burnett, with an arrival date of October 5, 2016 and a departure date of October 6, 2016.

6

    b. Officers encountered an adult female who will be referred to for purposes of this Affidavit as "Adult Female A" in room 230. Adult Female A was interviewed by officers and provided the following information:

        i. Adult Female A had learned from a friend that individuals who she knew as "JR" MARRIOTT, TAYLOR KARAS, and "Andrew" were involved in robbing a man. KARAS had purportedly called MARRIOTT and "Andrew" from the hotel room and told them that she knew someone they could rob.

        ii. Adult Female A was asked by her friend to clean up the Super 8 hotel room for any evidence left behind from the robbery. Adult Female A found a wallet that she believed belonged to the victim of the theft in the hotel room, and she disposed of it in a trash can at the bottom of one of the hotel's stairwells.

        iii. MARRIOTT currently had Adult Female A's silver 22-caliber revolver. The revolver had a brown handle with "RG" on it.

        iv. MARRIOTT utilized the alias "Chris Burnett".

        v. MARRIOTT and KARAS were currently staying at a hotel by the Dayton Mall (in Miami Township, Ohio).

    c. Officers searched the two hotel rooms and located three used syringes and a .40 caliber bullet in room 230. The bullet was located in the drain of the sink.

    d. Officers searched the hotel's trash can at the location described by Adult Female A. The officer recovered a Dick's Sporting Goods bag containing a wallet with a card in Adult Male A's name.

12. Later on October 7, 2016, Adult Male A was notified by US Bank that someone had attempted to utilize his Visa credit card at an Extended Stay hotel. Detective Garry Lawson of the Vandalia Police Department contacted an employee of the Extended Stay hotel in Miami Township, Ohio and inquired if a room was rented in MARRIOTT's or KARAS's name. The hotel employee identified that room 308 was currently rented in KARAS's name. The employee recalled seeing a male in this room and provided a description of the male's appearance. The description provided by the hotel employee was consistent with MARRIOTT's appearance.

7

13. It was determined that MARRIOTT had four outstanding warrants for his arrest for charges issued by the Courts of Common Pleas in Montgomery County, Ohio; Miami County, Ohio; and Greene County, Ohio. Based on the information obtained from Detective Lawson, officers of the Miami Township Police Department went to the Extended Stay hotel on October 7, 2016 in an attempt to locate and arrest MARRIOTT for his outstanding warrants.

    a. Officers located MARRIOTT and another adult male in room 308 of the hotel. During a search of MARRIOTT pursuant to his arrest, an officer located a US Bank Visa credit card in Adult Male A's name in a wallet in MARRIOTT's pant pocket.

    b. A black duffel bag was sitting on a chair in close proximity to the location where MARRIOTT was arrested. When an officer moved the bag off of the chair, a pair of black nylon dri-fit gloves fell and made loud noise when it hit the ground. The officer picked up the gloves and observed what appeared to be the handle of a gun coming out of the gloves. The item was removed, and it was identified as a Rohm GmbH revolver, Model RG23, 22-caliber, bearing serial number 49531, off-black in color with a brown handle. The revolver was loaded with approximately six rounds of ammunition, including one round in the chamber. The gun's appearance is consistent with the description Adult Male A provided of the gun used by MARRIOTT and AZZALINA during the kidnapping. The gun's appearance is also consistent with the description provided by Adult Female A of the gun she had given to MARRIOTT.

    c. The officer searched the duffel bag and located a brown wallet containing KARAS's identification card. Officers also observed two Android cellular telephones – **SUBJECT DEVICE-1** and **SUBJECT DEVICE-2** – on a dresser in the hotel room. The Android phones and the wallet were seized by officers and later booked into the Evidence Room at the Miami Township Police Department.

    d. Officers also located Adult Male A's iPhone in the hotel room and his 2008 Ford Explorer Sport Trac vehicle parked on the east side of the hotel's parking lot.

    e. MARRIOTT was transported to and booked into the Montgomery County (Ohio) Jail for his four outstanding warrants. Detective Lawson attempted to interview MARRIOTT, but MARRIOTT invoked his right to counsel.

14. On October 11, 2016, AZZALINA was arrested by an officer of the Eaton (Ohio) Police Department for a felony Grand Theft of a Motor Vehicle offense and a misdemeanor

8

Criminal Damaging offense. He was booked into the Preble County (Ohio) Jail. **SUBJECT DEVICE-3** was entered into AZZALINA's personal property at the Preble County Jail during the booking process.

15. On October 13, 2016, detectives of the Vandalia Police Department and Richmond Police Department contacted AZZALINA at the Preble County Jail. AZZALINA agreed to talk to the detectives after being advised of his Miranda rights. Detectives asked AZZALINA to describe what transpired when he, MARRIOTT, KARAS, and an elderly man (referring to Adult Male A) drove from the Super 8 hotel in Vandalia, Ohio to Dick's Sporting Goods Store in Richmond, Indiana. In summary, AZZALINA provided the following information throughout the interview:

    a. AZZALINA initially denied being in a vehicle with Adult Male A or having any knowledge of or involvement in the noted trip. AZZALINA also denied being at the Super 8 hotel.

    b. AZZALINA later acknowledged that he traveled with MARRIOTT, KARAS, and Adult Male A from Ohio to Indiana. AZZALINA acknowledged that he drove the vehicle for at least part of the trip. Consistent with the information provided by Adult Male A, AZZALINA reported that Adult Male A was in the front passenger seat and that MARRIOTT and KARAS were in the back seat.

    c. AZZALINA claimed that Adult Male A was never kidnapped or held against his will, but rather that Adult Male A had sex with KARAS in Ohio and was trying to pay her for the sexual activities. AZZALINA further claimed that because Adult Male A could not remember the PIN number for his credit card, he offered to buy MARRIOTT, KARAS, and AZZALINA clothing and other items.

    d. AZZALINA confirmed that they traveled to a Dollar General store, where MARRIOTT and KARAS purchased items. He acknowledged that they may have stopped at a bank, but he claimed to not recall anyone trying to withdraw money at an ATM. AZZALINA denied being involved in or having any knowledge of Adult Male A's belongings being thrown out of the car. AZZALINA rather claimed that Adult Male A went through his paperwork while in the vehicle and was worried about not being able to pay his traffic ticket.

    e. AZZALINA denied that anyone ever threatened to harm Adult Male A. AZZALINA first denied that there was ever a gun in the vehicle. AZZALINA later admitted that MARRIOTT had a revolver, and that MARRIOTT may have pointed it "out" at one point. However, AZZALINA denied that anyone ever

9

threatened Adult Male A with the gun. AZZALINA further denied that he ever touched the gun.

    f. AZZALINA claimed that Adult Male A intended to give MARRIOTT and KARAS his vehicle. AZZALINA also claimed that Adult Male A intended to rent a vehicle in Indiana, and that AZZALINA was going to drive Adult Male A back to Ohio in the vehicle.

    g. AZZALINA stated that when they arrived at Dick's Sporting Goods Store in Richmond, Indiana, Adult Male A offered to buy everyone clothing. AZZALINA stated that he remained in the vehicle but went in for a brief period of time to pick out a backpack. AZZALINA claimed that when MARRIOTT and KARAS returned to the vehicle, MARRIOTT said that Adult Male A was in the bathroom and that it was time to leave. AZZALINA claimed that he did not want to leave Adult Male A at the store but complied with the instructions to leave. They then drove back to Ohio in Adult Male A's vehicle.

    h. AZZALINA requested to return to his jail cell, and the interview was terminated.

16. As part of the investigation, Detective Lawson has requested surveillance footage from the various locations where Adult Male A identified as being taken to by MARRIOTT, AZZALINA, and KARAS. To-date, video footage has been provided by the Dollar General Store in Lewisburg, Ohio and still-image footage has been provided by the Chase Bank in Englewood, Ohio. The following information was obtained from review of this footage:

    a. Surveillance footage from the Chase Bank captured what appeared to be Adult Male A's vehicle at an ATM. The footage captured an individual appearing to be MARRIOTT leaning out of the rear driver's side of the vehicle and attempting to conduct a transaction at approximately 2:03 p.m.

    b. Surveillance footage from the Dollar General store captured two individuals appearing to be MARRIOTT and KARAS purchasing items at the cash register shortly after 3:00 p.m.

17. Based on the information provided by Adult Male A about where MARRIOTT and AZZALINA disposed of his paperwork and belongings, Detective Lawson (with the assistance of a deputy from the Preble County Sheriff's Office) identified a possible location that matched the description – that being near the intersection of New Market Banta Road and Lexington Salem Road in West Alexandria, Ohio. Detective Lawson

10

searched the area surrounding this intersection and located a number of documents and belongings scattered about the grass. These items included an Owner's Guide, Warranty Guide, registration paperwork, and other manuals for Adult Male A's vehicle; a traffic citation issued to Adult Male A; and various other documents with Adult Male A's or his wife's name on them. Detective Lawson also noted that there was a stone quarry near the intersection.

18. Pursuant to the consent of Adult Male A, a representative from US Bank verbally provided your Affiant with information about transactions that had cleared Adult Male A's Visa credit card on October 6 and 7, 2016. According to the information from the bank employee, the following transactions were made during the evening hours of October 6, 2016 (after Adult Male A was left at Dick's Sporting Goods): $5.58 transaction at Cite Mart in Beavercreek, Ohio and $7.22 and $1.38 transactions at Marathon Petrol in Dayton, Ohio. The following transactions were made on October 7, 2016: $20.34 transaction at Shell Gas Station in Beavercreek, Ohio and an attempted transaction that was declined at Extended Stay in Dayton, Ohio.

19. Review of MARRIOTT's criminal history and various court documents identified that he was previously convicted of the following felony offenses:

    a. In 2006, MARRIOTT pled guilty in the Clark County, Ohio Court of Common Pleas to one count of Possession of Drugs, in violation of Ohio Revised Code (O.R.C.) Section 2925.11 (pursuant to case number 06CR0490). He was originally sentenced to a term of community control, but after violating the terms of his probation, he was sentenced to 12 months imprisonment (to be served consecutively to the term imposed in case 07CR1114B).

    b. In 2007, MARRIOTT was convicted pursuant to a jury trial in the Clark County, Ohio Court of Common Pleas to two counts of Aggravated Burglary, in violation of O.R.C. Section 2911.11 (pursuant to case number 07CR1114B). He was sentenced to eight years imprisonment.

    c. In 2016, MARRIOTT pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Aggravated Possession of Drugs, in violation of O.R.C. 2925.11(A), and one count of Having Weapons While Under Disability, in violation of O.R.C. 2923.13(A)(2) (pursuant to case number 16CR0960). He failed to appear at his sentencing hearing, and a warrant was issued for his arrest in September 2016. He remained at large until he was arrested on October 7, 2016 (as detailed above).

11

20. Review of AZZALINA's criminal history and various court documents identified that he was previously convicted of the following felony offenses:

    a. In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Complicity to Theft, in violation of O.R.C. Section 2923.03(A)(2) (pursuant to case number 13CR011242). He was sentenced to three years of community control.

    b. In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Theft, in violation of O.R.C. Section 2913.02(A)(1) (pursuant to case number 13CR011265). He was sentenced to three years of community control.

    c. In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, in violation of O.R.C. Section 2925.041(A) (pursuant to case number 13CR011299). He was sentenced to three years of community control.

    d. In 2015, AZZALINA was arrested for violating the terms of his community control set forth in Preble County, Ohio Court of Common Please case numbers 13CR011242, 13CR011265, and 13CR011299 (as detailed above). He was thereafter sentenced to two years imprisonment.

    e. In 2014, AZZALINA pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Theft, in violation of O.R.C. Section 2913.02(A)(1), and one count of Tampering with Evidence, in violation of O.R.C. Section 2921.12(A)(1) (pursuant to case number 14CR00102/2). He was sentenced to five years of community control.

21. Based on the convictions detailed above, both MARRIOTT and AZZALINA were prohibited from possessing a firearm.

22. As part of the investigation, Special Agent (SA) Christopher Reed of the Bureau of Alcohol, Tobacco, Firearms, and Explosives was consulted regarding the Rohm GmbH Model RG23 22-caliber revolver. SA Reed informed your Affiant that revolvers of this make and model were manufactured outside the state of Ohio and therefore traveled in interstate commerce prior to being possessed by MARRIOTT and AZZALINA.

12

## EVIDENCE AVAILABLE ON CELLULAR TELEPHONES

23. As detailed above, **SUBJECT DEVICE-1** and **SUBJECT DEVICE-2** were located in the hotel room where MARRIOTT was arrested. Also as detailed above, this hotel room was rented in KARAS's name and contained at least some of her belongings. As such, it is reasonable to believe that MARRIOTT and/or KARAS used these devices.

24. Again as detailed above, **SUBJECT DEVICE-3** was booked into AZZALINA's property at the Preble County Jail pursuant to his arrest. It is therefore reasonable to believe that AZZALINA was the user of this device.

25. Adult Male A noted that MARRIOTT telephonically contacted AZZALINA while they were at the Dick's Sporting Goods store in Richmond, Indiana (as further detailed above). Adult Female A also noted that KARAS had purportedly called MARRIOTT and AZZALINA from the Super 8 hotel room and told them about her idea to rob Adult Male A (again as further detailed above). It is therefore reasonable to believe MARRIOTT, AZZALINA, and KARAS used cellular telephones (to potentially include **SUBJECT DEVICE-1**, **SUBJECT DEVICE-2**, and/or **SUBJECT DEVICE-3**) in the commission of their criminal activities and brought these devices with them when they traveled from Ohio to Indiana.

26. Based on my training and experience, I know that individuals involved in kidnapping, firearms, and theft offenses often use a variety of electronic devices in the commission of the offenses. Offenders utilize cellular telephones (such as those described in Attachments A-1 through A-3) to communicate with co-conspirators about various aspects of the criminal activities. Such communications include, among others, coordinating and planning for the kidnappings and thefts; discussing use of the proceeds from the thefts; and discussing the use of firearms. The communications may be in various forms, including telephone calls, text messages, email communications, and Internet and cellular telephone-based messenger applications.

27. Again based on my training and experience, I know that offenders often utilize cellular telephones to conduct Internet searches related to their criminal activities. Such Internet searches may include searching for maps and directions to the locations of the criminal activities (such as locations of the kidnapping, thefts, and locations where firearms are purchased or used), researching the retail value of vehicles and other stolen items, and researching types and values of firearms.

28. In my experience, I know that most cellular telephones have digital cameras and video recording devices. Offenders sometimes use these cameras and video recorders to take

13

pictures and videos of victims, stolen items, and firearms. Offenders may also photograph and video record their surroundings during the times that the criminal activities took place and/or during their travels to these locations. Such photographs and video recordings can be useful in determining the locations of criminal activities and items used in the commission of the criminal activities.

29. I also know, in my experience, that many cellular telephones can connect to the wireless Internet service of residences and businesses that the users' frequent. I know that some cellular telephones and tablets have GPS devices. The IP addresses and the GPS information stored on the devices can be materially relevant in determining the locations of criminal activities and the travels to get to these locations.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33. I submit that this Affidavit supports probable cause for a search warrants authorizing the examination of the devices described in Attachments A-1 through A-3 to seek the items described in Attachment B-1 through B-3.

                                                                                    _____
                                                                                    Andrea R. Kinzig
                                                                                    Special Agent, FBI

Subscribed and sworn to before me
This 18th day of October, 2016

_____
MICHAEL J. NEWMAN
United States Magistrate Judge

## ATTACHMENT A-1

The property to be searched is a Verizon HTC cellular telephone, Model 100L, bearing serial number FA61MSX00194 and IMEI number 990005708930061 ("Subject Device-1"). Subject Device-1 is currently located at the Miami Township Police Department, 2660 Lyons Road, Miamisburg, Ohio, 45342.

This warrant authorizes the forensic examination of the Subject Device-1 for the purpose of identifying the electronically stored information described in Attachment B-1.

## ATTACHMENT B-1

1. All records on the Subject Device-1 described in Attachment A-1 that relate to violations of involving 18 U.S.C. §371 (Conspiracy), 18 U.S.C. §1201 (Kidnapping), 18 U.S.C. §924(c) (Use of a Firearm During and in Relation of a Crime of Violence), 18 U.S.C. §922(g) (Possession of a Firearm by a Prohibited Person), 18 U.S.C. §2312 (Interstate Transportation of Stolen Vehicles), and 18 U.S.C. §2313 (Receipt, Possession, Storage, Concealment, Barter, Sale, and Disposal of Interstate Stolen Vehicles), from January 1, 2016 to the present, including:

   a. Any communications regarding kidnapping; theft; and transportation, sale, or receipt of stolen vehicles;

   b. Any communications about identifying and locating victims of kidnapping and theft offenses;

   c. Any communications regarding the possession, acquisition, and use firearms;

   d. Any contact / identifying information for individuals involved in the communications about the above noted offenses;

   e. Any Internet searches regarding kidnapping and theft offenses;

   f. Any Internet searches regarding the possession, acquisition, and use firearms;

   g. Any maps, directions, GPS information, IP addresses, and other location information related to the execution of the above noted offenses;

   h. Any images and/or videos depicting victims, stolen vehicles and other items, firearms, or surroundings where criminal activities transpired.

2. Evidence of user attribution showing who used or owned Subject Device-1 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## Attachment C-1

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §371 | Conspiracy |
| 18 U.S.C. §1201 | Kidnapping |
| 18 U.S.C. §924(c) | Use of a Firearm During and in Relation of a Crime of Violence |
| 18 U.S.C. §922(g) | Possession of a Firearm by a Prohibited Person |
| 18 U.S.C. §2312 | Interstate Transportation of Stolen Vehicles |
| 18 U.S.C. §2313 | Interstate Sale or Receipt of Stolen Vehicles |